UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ARMONDO HERNANDEZ,

        Petitioner,

    v.

CLARK DUCART,

        Defendants.

No. 2:16-CV-2527 GGH

ORDER & FINDINGS AND
RECOMMENDATIONS[1]

*Introduction and Summary*

This complex case involves the ongoing warfare, i.e., hunt down and injure/kill rivals, between gang members, here the Sureño versus Norteño. Petitioner contests the presentation of dual theories of liability, one valid and one invalid, with respect to assault with likely great bodily injury, as well as sufficiency of evidence issues. Petitioner also concedes he was a member of the Proud Brown Trece; he contests the evidence that implicated him as a Sureño member, the pertinence of Sureños to this case, along with the attendant gang enhancements.

////

---

[1] Petitioner has consented to the undersigned presiding. However, despite a court order requirement that Respondent communicate an acceptance or declination of magistrate judge jurisdiction to preside, no such communication was made. Therefore, the undersigned will order the Clerk to assign a district judge.

Petitioner was convicted of some, but not all assaults, and he was found to be liable in one

murder.  For the reasons set forth below, the petition should be denied.

*Factual Background*

   The facts of the various assaults are well set forth in the Opinion after Transfer of the

California Court of Appeal[2]:

> Defendants' crimes occurred on two days, December 16 and 18, 2009.[3]  Four perpetrators were prosecuted, including the three defendants here.  The fourth, Jose Hernandez, was a minor at the time of the crimes, and he was tried separately.[4] Not every defendant participated in every crime, but all participated in some.
>
> Defendants are members of the Proud Brown Trece subset of the Sureños criminal street gang, which is a rival of the Norteños criminal street gang.  We do not relate here the specific facts supporting their designation as gang members, but we fully discuss those facts later in relation to their contentions concerning gang allegations and findings.
>
> Two juries heard the evidence in this proceeding—one jury as to defendant Flores and the other as to defendants' Arias and Hernandez.  Defendant Flores had a separate jury mainly because he gave a statement to police concerning the crimes and implicating his codefendants. While we refer to the statement of defendant Flores in this factual summary, that evidence was not presented against defendants Arias and Hernandez and is not being considered with respect to the contentions of defendants Arias and Hernandez.
>
> A.  Assault on John Doe (count 12 as to defendant Flores only)
>
> The gang's crime spree began on December 16, when defendant Flores and several associates saw a Norteño gang member, and some of defendant Flores's group chased him.  Someone in the group shot at the Norteño three to five times.
>
> In his statement, defendant Flores said that he joined defendant Arias, Jose Hernandez, and others whom he did not know or identify, in the search for a particular Norteño.  They did not find that specific Norteño, but they found another. Although defendant Flores claimed he stayed in the truck, others got out and confronted

---

[2] The initial appellate decision was appealed to the California Supreme Court which then transferred the case back to the appellate court in light of a recent case decision.  See text infra. The facts are taken from that second opinion.

[3] [Fn. 1 in original excerpted text] All dates in this opinion refer to 2009.

[4] [Fn. 2 in original excerpted text] Jose Hernandez was convicted of attempted murder and other crimes and sentenced to a total term of 61 years to life.  He has appealed the judgment. (C067260.) In this opinion we refer to Jose Hernandez by his full name and to Armondo Hernandez, who is one of the three defendants prosecuted together, as defendant Hernandez.

the Norteño. They asked if he was a Norteño, and he confirmed it. They then chased the Norteño, and Jose Hernandez fired the shots, which probably did not hit the man.

## B. Assaults on Edward Rigor and Melanie Bartolomei (counts 1, 3 & 4 as to defendants Flores and Arias only)

Also on the evening of December 16, defendants Flores and Arias, along with one other person, followed Edward Rigor and Melanie Bartolomei into an apartment complex. Either defendant Flores or defendant Arias challenged Rigor, who used to be a Norteño, to say, "[F]uck [N]orte," which he refused to do. As Rigor and Bartolomei walked away, one of the defendants fired four or five rounds in the direction of Rigor and Bartolomei. Two bullets struck Rigor, and one pierced his right lung. A bullet also went through an apartment window. Bartolomei identified defendant Arias as the gunman, but Rigor identified defendant Flores as the gunman.

In defendant Flores's statement to police, he claimed that he drove the group to the apartment complex but that he stayed in the truck and kept the engine running while the others went into the apartment complex to confront the man they suspected of being a Norteño. Defendant Flores heard one gunshot, and he drove away after the others got back in the truck.

## C. Assault on James Stancampiano (counts 5 & 6 as to defendant Flores only)

Again on the evening of December 16, five or six shots were fired in the vicinity of a shopping center with a Supercuts hair salon. Norteño gang member James Stancampiano, panicked and shaky, ran into the Supercuts. He asked to use a telephone, and he called someone and pleaded for a ride from the person he called. He told the salon manager that someone was shooting at him. Three men appeared outside of Supercuts. Defendant Flores opened the door and told the people inside that they needed to get Stancampiano out of there because the police were after him. The salon manager told Stancampiano to leave, Stancampiano peeked out the door, and then ran away.

In his statement to police, defendant Flores said that they saw a Norteño, so some of the others in the group got out of the truck and chased the Norteño while defendant Flores stayed in the truck. Someone shot at Stancampiano three or four times until he escaped into the shopping center. Defendant Flores parked the truck and helped search for Stancampiano. They found him at Supercuts, but defendant Flores claimed it was defendant Arias who opened the door and told the people inside to make Stancampiano leave.

On December 18, defendant Flores had a text messaging conversation with someone in which he texted that (1) they were "going to shoot chapetas," (2) on December 16 they had "shot three," and (3) they had "hit the target."

////

3

D. Assaults on David Zepeda and Angelo DeHaro (counts 7 & 8 as to all defendants)

Between 9:00 and 9:30 p.m. on December 18, defendant Flores was stopped in his GMC Yukon by a Tracy police officer near the Bonfare Market. The officer impounded the Yukon because defendant Flores did not have a driver's license.

After his vehicle was impounded, defendant Flores communicated by text and phone calls with defendant Arias and went into the Bonfare Market. Security camera footage from the market showed that defendant Flores walked into the market as three people— Spencer Sampson and Robert Limon (both Norteños) and Stephanie Sampson—were leaving. Spencer Sampson and defendant Flores exchanged words, but Spencer Sampson and his group left the store.

In his statement to police, defendant Flores said that he, defendant Arias, defendant Hernandez, and others met up and went looking for the Norteños who had insulted him at the market.

Around 10:00 p.m. on December 18, Angelo DeHaro was walking along a street with David Zepeda when they heard a whistle and saw three or four people running toward them. The approaching men were wearing bandanas over their faces, and one of them was holding a silver object in his hand. DeHaro and Zepeda began running and split up.

DeHaro was hit in the back of the head with a rock. He fell to the ground face first, but he was able to get back up and flee. Another rock went over his shoulder. His head injury required five staples. DeHaro identified defendant Arias as the assailant who was holding the silver object in his hand.

Zepeda slipped on a wet lawn and fell. Before he could get back up, four men attacked him. They kicked and punched him in the upper body, stomach, and head, and they told him to say, "[F]uck [N]orte." Zepeda rolled into a ball and covered his head with his hands and arms to try to protect himself. One of the men pointed the silver object, which was a gun, at Zepeda's face while the others beat him. Zepeda sustained lumps, bruises, and scratches from the attack. He identified defendant Hernandez as one of the assailants.

In his statement to police, defendant Flores said that he and his group attacked DeHaro and Zepeda.

E. Murder of Spencer Sampson (count 9 as to all defendants) and assaults on Stephanie Sampson (count 10 as to defendant Flores only) and Robert Limon (count 11 as to all defendants)

After the attack on DeHaro and Zepeda, defendants' group found the Sampsons and Limon, who were on foot. The group got out of their car and approached the three, wanting to fight. They circled around Stephanie Sampson, demanding that she say, "[F]uck [N]orte." Spencer Sampson intervened, and someone in defendants'

4

group lifted up his shirt, showing a gun. Then someone struck Stephanie Sampson in the ear, which touched off fighting.

Two men from defendants' group fought with Limon and knocked him to the ground. Another fought with Spencer Sampson. After a brief period of fighting, someone in defendants' group shot Spencer Sampson. Defendants' group then fled in their car. Spencer Sampson died of a gunshot wound to the chest.

Stephanie Sampson identified defendant Arias as the one who had the gun and fought with Spencer Sampson, and she identified defendants Flores and Hernandez as the two who initially fought with Limon.

In his statement to police, defendant Flores described how his group drove around until they found the Sampsons and Limon. He claimed that he did not know how Spencer Sampson was shot and that he did not know someone had a gun, although he acknowledged that they always carried a gun. He also claimed that defendant Hernandez had the gun during the attack. Defendant Flores said that he just wanted to scare the Norteños and did not know anyone would get shot.

As with defendant Flores's statement to police, his text messages soon after the murder of Spencer Sampson were presented to his jury only. He texted a friend, "First we fucked two that weren't [Norteños], and then we found the three and we shot one."

People v. Hernandez, 2016 WL 879233 *1-3 (Cal. Ct. App. Mar. 8, 2016), reh'g denied (Apr. 5, 2016), review denied (June 15, 2016).

*AEDPA Standards*

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254(d) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

////

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) citing Greene v. Fisher, 565 U.S. 34, 39 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000). Circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) citing Parker v. Matthews, 587 U.S. 37, 48 (2012). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id.

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, supra, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir.2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra, 529 U.S. at 412. See also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the state court was 'erroneous.'" "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington, supra, 562 U.S. at 103.

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, supra, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc). "[Section] 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" Harrington, supra, 562 U.S. at 100. Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100. Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume  (subject to rebuttal) that the federal claim was adjudicated on the merits." Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, supra, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision. Early v. Packer, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, supra, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003). "Independent review of the record is not de novo review of the constitutional

issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Id. at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state

court to deny relief." Harrington, supra, 562 U.S. at 98. A summary denial is presumed to be a denial on the merits of the petitioner's claims. Stancle v. Clay, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Harrington, supra, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'" Id. at 101 quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Emphasizing the stringency of this standard, which "stops short of imposing a complete bar of federal court relitigation of claims already rejected in state court proceedings [,]" the Supreme Court has cautioned that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102, citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

 With these principles in mind the court turns to the merits of the petition.

*Issues*

 1. Ground 1(a)- Aggravated Assault Counts (7 and 11) Were Instructed with Valid and Invalid Theories[5]

 2. Ground 1 (b)- The Murder Count (9) May Have Been Invalidly Related to the Assault Convictions, Counts 7 and 11

 3. Ground 2- Insufficient Evidence for Gang Enhancement and Improper Instructions

---

[5] It is not completely clear why petitioner did not choose to contest Count 8 for which he was convicted (aggravated assault), but he has chosen not to, and the undersigned will not add it to the Petition.

1    4.  Ground 3—Improper Instructions Regarding the Gang Enhancement

2    5.  Ground 4—Improper Excusal of Juror

3    *Discussion*

4    **<u>Ground 1 (a)--Valid and Invalid Theories of the Case</u>**

5        Important to the discussion herein are the various iterations of the crimes with which

6    petitioner was prosecuted.  Petitioner alleges that the jury was informed that "hands and feet" are

7    equated with dangerous weapons which is not California law.  Although petitioner asserts that the

8    federal issue revolves about the requirement that every element of the crime be proven beyond a

9    reasonable doubt, petitioner actually argues that because the jury was presented with a legally

10   invalid alternative (hands and feet as a dangerous weapon), it is not possible to determine whether

11   the jury convicted on that theory as opposed to the valid alternative (force likely to result in great

12   bodily injury).  <u>See</u> Petition at ECF No. 1, electronic pagination 5 (hereafter "E-page.")  While

13   petitioner is initially correct in his argument, he is ultimately incorrect that the unlawful

14   alternative presented to the jury resulted in a substantial and injurious harm to the verdict.

15       The discussion starts with the charging Information:

16             COUNT: 007, for a further and separate cause of complaint, being
          a different offense from but connected in its commission with the
17        charge set forth in Count 006, complainant further complains and
          says: On or about 12/18/2009 the crime of ASSAULT BY MEANS
18        OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY
          OR WITH DEADLY WEAPON AND INSTRUMENT in violation
19        of Section 245(a) (1) of the Penal Code, a FELONY was committed
          by ROBERTO ARIAS, MARTIN FLORES, AND ARMANDO
20        HERNANDEZ, who at the time and place last aforesaid, did
          willfully and unlawfully commit an assault upon DAVID ZEPEDA,
21        with a deadly weapon, to wit, HANDS AND FEET, or by means of
          force likely to produce great bodily injury.
22

23             COUNT: 008, for a further and separate cause of complaint, being
          different offense from but connected in its commission with the
24        charge set forth in Count 007, complainant further complains  and
          says: On or about 12/18/2009 the crime of ASSAULT BY MEANS
25        OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY
          OR WITH DEADLY WEAPON AND INSTRUMENT in violation
26        of Section 245{a) (1) of the Penal Code, a FELONY was
          committed by ROBERTO ARIAS, MARTIN  FLORES, AND
27        ARMANDO  HERNANDEZ, who at the time and place last
          aforesaid, did willfully and unlawfully commit an assault upon
28        ANGELO DEHARO, with a deadly weapon, to wit, ROCK, or by
          means of force likely to produce great bodily injury.

COUNT: 011, for a further and separate cause of complaint, being a different offense from but connected in its commission with the charge set forth in Count 010, complainant further complains and says: On or about 12/18/2009 the crime of ASSAULT BY MEANS OF FORCE LIKELY TO PRODUCE GREAT BODILY INJURY OR WITH DEADLY WEAPON AND INSTRUMENT in violation of Section 245(a) (1) of the Penal Code, a FELONY was committed by ROBERTO ARIAS, MARTIN  FLORES, AND ARMANDO HERNANDEZ, who at the time and place last  aforesaid, did willfully and unlawfully commit an assault upon  ROBERT LIMON, with a deadly weapon, to wit, HANDS/FEET, or by means of force likely to produce great bodily injury.

ECF No. 20-3 at E-pages 251-257 (enhancement counts and murder count omitted).

This information was not read to the jury, and the prosecutor made no mention of hands and feet being dangerous weapons when she outlined the offenses in her opening statement:

Counts 7, 8, 10 and 11, are all separate victims; David Zepeda, Angelo DeHaro, Stephanie Sampson, Robert Limon.  The elements to 245(a) (1) is the same as the elements to Count 3 under 245(a) (2), with the exception that this particular offense is not with use of a firearm.   All of the other elements are the same. *So the only difference would be that the defendant did an act that, by its nature, would directly and probably result in the application of force to a person and the force was likely to produce great bodily injury.*

ECF No. 20-21 at E-page 41 (emphasis added).

The "deadly weapon" language crept back in when the jury instructions were read.[6]  After all, some of the counts did involve a deadly weapon—a firearm.  And a "deadly weapon" definition was given to the jury.

A "deadly weapon other then a firearm" is any object, instrument or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.

ECF No 20-18 at E-page 75.

But in no place, was the jury informed that it should consider hands and feet as a dangerous weapon.

////

---

[6] Why the "deadly weapon" language for Counts 7 and 11 was not excised from the instructions is unclear, but it is most likely that the rock could very well have been considered a deadly weapon.

So Defendant Arias and Hernandez are charged with Count 7, 245(a) (1), assault by means -- assault by means likely to cause great bodily injury or with a deadly weapon as to David Zepeda.

Both Defendant Arias and Hernandez are charged with 245(a), Count 8, assault with a deadly weapon or by force likely to cause great bodily injury as to Angelo DeHaro.

Both Defendant Arias and Hernandez are charged with Count 9, 187 of the Penal Code, murder as to Spencer Sampson.

Both Defendant Arias and Hernandez are charged in Count 11, 245(a) (1), assault with a deadly weapon or by force likely to cause great bodily injury as to Robert Limon.

ECF No. 20-18 at E-page 41.

To prove that the defendant is guilty of the crimes charged in Count 9, murder, the People must prove that:

1. The defendant conspired to commit one of the following crimes: Section 245 PC, assault with a deadly weapon or by force likely to cause great bodily injury as to Stephanie Sampson or Robert Limon.

[2] A member of the conspiracy committed murder to further the conspiracy; and

3. Murder was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit.

ECF No. 20-18 at E-page 63.

The defendants are charged in Count 7, 8 and 11 with assault with force likely to produce great bodily injury, or a deadly weapon other than a firearm. And Defendant Arias in Count 3, assault with a firearm, Section 245 of the Penal Code.

To prove a defendant is guilty of this crime, the People must prove that:

1. The defendant did an act with a deadly weapon other than a firearm or that, by its nature, would directly and probably result in application of force to a person, or the defendant did an act that, by its nature, would directly and probably result in the application of force to a person and the force used was likely to produce great bodily injury.

ECF No. 20-18 at E-page 73.

////

11

1   Nor did the prosecutor argue such in final argument in any counts which firearms were not used;

2   again, she argued that there needed to be force likely to cause great bodily injury:

3           Count 10 is assault with force likely to cause great bodily injury as
        to Stephanie Sampson.  Count 11 is the same count as to Robert
4       Limon.

5           You must first decide under natural and probable consequences if
        the defendant is guilty of either assault with force likely as to
6       Stephanie or Robert.  And when you find the defendant guilty
        because, of course, we have proved that beyond a reasonable doubt,
7       you must then decide if the defendant is guilty of murder.

8           To prove the defendant is guilty of murder, the People must prove
        that the defendant is guilty of the 245's, the assault with force
9       likely.  That during the commission of that 245, a coparticipant in
        that assault committed the crime of murder and, under all the
10      circumstances, a reasonable person in the defendant's position
        would have known that the commission of murder was a natural
11      and probable consequence of the commission of the assault with
        force likely.

12

13  ECF No. 20-17 at E-page 215.

14  As set forth by the Court of Appeal, the verdict forms gave the jury a choice for each of the

15  counts disputed here; one such verdict form is set forth below (ECF No. 20-18 at E-pages 123-

16  124):

17          As to Count 7.  We, the jury, in the above-entitled cause, find the
        defendant, Armando Hernandez, guilty of the crime of assault with
18      a deadly weapon or by means of force likely to cause great bodily
        injury upon David Zepeda, to wit: Hands and feet, in violation of
19      Penal Code Section 245 (a) (1), alleged to have occurred on or
        about December 18, 2009 as charged in Count 7 of the Information.
20      Dated this date. And signed by the foreperson.

21  Count 11 contained similar language.  Unlike the Information, the "hands and feet" language

22  came after the term "likely to cause great bodily injury," and not after "deadly weapon."

23          Petitioner seizes upon the "hands and feet language" in the verdict forms as indicative of

24  the invalid choice given to the jury.  The California Court of Appeal, observing that the revised

25  placement of the hands and feet language made all the difference in how the jury would perceive

26  its obligation, found that the jury would not be confused, i.e., it would not necessarily equate a

27  "deadly weapon" with hands and feet.  People v. Hernandez, 2016 WL 879233 at *14.  The Court

28  went on to find that giving the jury a choice on an alternative not supported by the evidence was a

12

"state law" issue, People v. Hernandez at 2016 WL 879233 *15, subject to the Watson harmless error test.

This last conclusion takes the issue out of the realm of AEDPA deference, as the state court expressly held that it was ruling on state grounds only.

The discussion starts with the California case which held that in order to be a "deadly weapon," the instrumentality *must* be an object which is extrinsic to the body. "[W]e conclude a 'deadly weapon' within the meaning of section 245 must be an object extrinsic to the human body." People v. Aguilar, 16 Cal. 4th 1023, 1034 (1997). No party to this petition disputes that law. And the court's holding includes both aspects of a deadly weapon be it inherently dangerous, or an object likely to produce great bodily injury. Thus, it was error to equate "hands and feet" to a deadly weapon. But the Aguilar court also recognized that it was "well established" that hands and feet could meet the alternative posited by the assault with a deadly weapon statute, Cal. Penal Code Section 245, i.e., the application of force itself no matter what the means which was likely to produce great bodily injury. Id. at 1028.

No party to this case disputes the fact that if the Information had been read to the jury, or it had been solely instructed in those terms, the jury would have been presented with a singular invalid legal theory upon which to convict. However, as set forth above, the jury was not solely presented with this theory; it was given *both* alternatives of section 245. The federal question presented here was whether petitioner's due process rights were violated by the presentation to the jury of an invalid theory and a valid theory.

Charging the jury with a *legally* invalid alternative will result in constitutional error subject to a harmless error test. Hedgepeth v. Pulido, 555 U.S. 57, 59-60 (2008). Charging the jury with a *factually* insufficient alternative results in no error at all as the jury will be presumed to have chosen the appropriate alternative from the evidence. Griffin v. United States, 502 U.S. 46, 56-60 (1991). See also Villegas v. People, 2015 WL 4270041 *9 (N.D. Cal. 2015). Factual insufficiency cannot be a valid argument for respondent here in that California law absolutely precludes evidence of "hands and feet" usage in an assault from ever being a deadly weapon. Why the prosecution in this case permitted such "hands and feet as a deadly weapon" language to

infect the Information in Counts 7 and 11, and why the prosecution presented the dual alternatives to the jury through instructions and verdict forms, almost ten years after the Aguilar case had been issued, is unknown. But it was mistaken in this presentation. Therefore, in this case with respect to Counts 7 and 11, the jury was presented with an invalid legal theory as an alternative.

Petitioner's mistake is believing that such a finding ends the discussion. However, as Hedgepeth held, the invalid theory error is not structural error, but an error subject to the federal harmless error test of Brecht v. Abrahamson, 507 U.S. 619 (1993) (substantial and injurious effect on the verdict). Although it is initially confusing that the "deadly weapon" definition contains the same alternative of likely great bodily injury as does the charging statute, section 245, albeit that the deadly weapon alternative language still must be committed by an object external to the body, it is not difficult to find that such error was harmless in this case.

The undersigned so finds for several reasons. First and foremost, the prosecutor in this case *never* presented the theory or argued that hands and feet could be equated with a deadly weapon. Indeed, as shown above, the simple argument was that the hands and feet force applied to the victims in Counts 7 and 11 was likely to produce great bodily injury. The presentation of the deadly weapon language in the jury instructions and the verdict forms was mere surplusage in terms of how the case was presented (except of course where an object extrinsic to the body was used to apply the force, e.g., Counts 8 (rock) or an inherently dangerous weapon, e.g., a firearm— Count 3). Secondly, the grossly erroneous Information language was not presented to the jury, and it was only the ambiguous alternative presented to the jury in written form. That is, the Information had expressly posited "hands and feet" as deadly weapons, but the instructions and verdict form contained the "hands and feet" language *after* the two alternatives of Section 245 were set forth. Thirdly, as Aguilar recognized at 1035, the thought process of the jury would have been nearly identical in arriving at a verdict regardless of whether it thought that hands and feet could be a deadly weapon that caused likely great bodily injury, or in simply arriving at a verdict under the assault statute that hands and feet supplied the force necessary for likely great

bodily injury.[7] 16 Cal. 4th at 1035.

        The undersigned now turns to petitioner's subsidiary arguments.  By simply repeating his Court of Appeal argument, petitioner goes on to claim that the evidence was insufficient in any event to demonstrate the jury's conclusion that great bodily injury was likely given the facts of the fights.  We return to AEDPA deference for this argument.  The Court of Appeal first defined the crime under state law:

> [W]hether the force used by the defendant was likely to produce great bodily injury is a question for the trier of fact to decide." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1221.) Because the statute focuses on "force likely to produce great bodily injury" (§ 245, former subd.  (a)(1)), the statute can be violated even if the victim suffers no harm at all.  (*Aguilar, supra*, 16 Cal.4th at p. 1028; *People v. Wingo* (1975) 14 Cal.3d 169, 176.) "While it is true that 'when the evidence shows that a blow has been struck or a physical injury actually inflicted, the nature and extent of the injury is a relevant and often controlling factor in determining whether the force used was of a felonious character' [citations], an injury is not an element of the crime, and the extent of any injury is not determinative.  'The crime ... like other assaults, may be committed without infliction of any physical injury, and even though no blow is actually struck.  [Citation.] The issue, therefore, is not whether serious injury was caused, but whether the force used was such as would be likely to cause it.' [Citations.]" (*People v. Covino* (1980) 100 Cal.App.3d 660, 667.) "The statute prohibits an assault by any means of force likely to produce great bodily injury, not the use of force which does in fact produce such injury.  While ... the results of an assault are often highly probative of the amount of force used, they cannot be conclusive." (*People v. Muir* (1966) 244 Cal.App.2d 598, 604, italics omitted; *People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065–1066.) "[T]he question of whether or not the force used was such as to have been likely to produce great bodily injury, is one of fact for the determination of the jury based on all the evidence, including but not limited to injury inflicted." (*People v. Muir*, supra, at p. 604; in accord, *see also People v. Armstrong, supra*, at p. 1066, and *People v. Sargent, supra*, at p. 1221.) "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. Covino, supra*, p. 668; *People v. Armstrong, supra*, at p. 1066.)

People v. Hernandez, 2016 WL 879233 at *15.

*////*

---

[7] It might well be that the harmless error discussion in <u>Aguilar</u>, even stricter than that of <u>Brecht</u>, mirrors the harmless error discussion here.  However, the undersigned took the Court of Appeal in this case at its word that only state law error was involved, and has proceeded accordingly without AEDPA deference.

Forgetting about the fact that the victims were greatly outnumbered by his assailants, petitioner points to the relatively short time the victims were under attack, and the dearth of serious injuries suffered. Petitioner does not so much disagree with the evidence relied upon by the Court of Appeal, but he takes issue with the likely great bodily injury inferences to be drawn from that evidence. The Court of Appeal held:

> [Count 7] Zepeda testified that he was walking with Angelo DeHaro on the sidewalk at about 10:00 p.m. on December 18, 2009, when he heard a whistle and saw men, with bandanas over their faces, starting to chase him. He ran but slipped on wet grass. Before he could stand up fully, defendants attacked him. He fell back to the ground as they kicked him and beat him in the upper body, including his stomach and head. While they were attacking Zepeda, they told him to say, "[F]uck [N]orte." One assailant pointed a gun at his face. He curled up into a ball, covering his face and head with his arms and hands, trying to protect himself. Towards the end of the attack, an assailant told the others, "Let's go. Let's get out of here." The attack lasted a few seconds. Zepeda sustained lumps on his head, as well as bruises and scratches on his body. He went to the hospital that night but did not receive medical care for his injuries.

> The evidence of the assault on Zepeda was sufficient to establish that it was committed by means of force likely to produce great bodily injury. Zepeda was punched and kicked repeatedly in the head and upper body while he was on the ground. He did not suffer great bodily injury because he curled up in a ball and protected his face and head with his arms and hands. Even doing so, he sustained lumps on his head, as well as bruises and scratches on his body. The jury could have inferred that, if Zepeda had not protected himself, he would have been severely injured.

> […]

> [Count 11] Limon testified that he, Stephanie Sampson, and Spencer Sampson left Bonfare Market on foot together on the evening of December 18, 2009. Soon after they left the market, some men passed them in a red car. The car came to a stop and the men got out of the car, running toward Limon and the Sampsons aggressively. Two of the assailants attacked Limon, who tried to fight them off. They landed blows on Limon, even though he was trying to protect himself. Eventually, the attack got "out of control," and Limon was knocked to the ground. He heard a shot fired, so he stayed on the ground to avoid being shot. Stephanie Sampson testified that she saw that Limon was on the ground and two of the assailants were "jumping" him. When asked on cross-examination whether the assailants had "pummel[ed]" him, Limon said, "No."

> This evidence of the assault on Limon was also sufficient to establish that it was committed by means of force likely to produce great bodily injury. Defendants approached Limon aggressively

and attacked him, apparently with their fists. The attack got "out of control" and was violent enough to knock Limon to the ground, even though he was trying to protect himself. While Limon testified that defendants did not "pummel" him, the jury could have concluded that was mere boasting despite the evidence that defendants landed blows on Limon and knocked him to the ground.

People v Hernandez 2016 WL 879233 at *15-16.

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "After AEDPA, we apply the standards of Jackson with an additional layer of deference." Juan H. v. Allen, 408 F.3d at 1274. See also the AEDPA standards set forth above. Moreover, petitioner's challenge to the sufficiency of evidence based on credibility of the witnesses is not cognizable in an insufficient evidence claim. See McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir.1994); see also Schlup v. Delo, 513 U.S. 298, 330 (1995) (recognizing that the credibility of witnesses is generally beyond the scope of sufficiency of the evidence review).

Therefore, when a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson, supra, at 319. In Jackson the Supreme Court articulated a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence. United States v. Nevils, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).

First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution. *Jackson*, U.S. at 319, 99 S.Ct. 2781. [...] [W]hen "faced with a record of historical facts that supports conflicting inferences" a reviewing court "must presume—even if it does not affirmatively appear in the record— that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct.

2781; *see also McDaniel*, 130 S.Ct. at 673–74.

> Second, after viewing the evidence in the light most favorable to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319, 99 S.Ct. 2781.

> […]

> At this second step, we must reverse the verdict if the evidence of innocence, or lack of evidence of guilt, is such that all rational fact finders would have to conclude that the evidence of guilt fails to establish every element of the crime beyond a reasonable doubt.

Nevils, 598 F.3d at 1164–65.

And, where the trier of fact could draw conflicting inferences from the facts presented, one favoring guilt and the other not, the reviewing court will assign the one which favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).

Upon the undersigned' review of the pertinent transcripts, petitioner has failed to show that reasonable jurists could not agree with the analysis of the Court of Appeal. Although in Limon's case, there does not appear to be much more than a two-on-one fight, and no serious resulting injury, a jury could have viewed the fact that Limon was down on the ground being "jumped on" by two assailants, RT 20-12 at E-page 1927 (Stephanie Spencer testimony) as a situation where it was likely that a continued beating would lead to great bodily injury. This claim should be denied.

### Ground 1(b)-- The Murder Count (9) May Have Been Invalidly Related to the Assault Convictions, Counts 7 and 11

In Count 9 (murder of Spencer Sampson), the jury found with respect to petitioner:

> Count 9: guilty of murder of Spencer Sampson (§ 187, subd. (a)).

> True findings: murder in the second degree (§ 189);

> a principal intentionally and personally discharged a firearm causing death (§ 12022.53, subd. (d) & (e)); committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

People v. Hernandez 2016 WL 879233 at *4.

////

18

The prosecutor argued before instructions were read:

> To prove the defendant is guilty of murder, the People must prove that the defendant is guilty of the 245's, the assault with force likely. That during the commission of that 245, a coparticipant in that assault committed the crime of murder and, under all the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the assault with force likely.
>
> A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or an innocent bystander.
>
> The People allege that the intentional -- the initial, at the bare minimum -- we believe that they intended to kill Spencer Sampson, but, at the very bare minimum, they intended to find him and assault them. And in the course of that assault, they murdered him.
>
> Just because there was only one shooter, don't be misled. There were four murderers out there that night, four. Every last one of them. Lobo, Santos, Chucky and Martin. Every last one of them knew exactly what was going to happen. As a gang member, you know, you know what's going to happen.
>
> And that's why when you look at this theory and what the law allows the People to prove, the defendant is guilty of murder because we have proven that the defendant, at the bare minimum, aided and abetted the assault of either Robert Limon or Stephanie Sampson, and the murder was the natural and probable consequence of that.

ECF No. 20-17 at E-pages 215-216.

The jury instruction given mirrored the argument:

> The defendants are charged in Count 9 with murder; and in Count 11 with assault with a deadly weapon or force likely to cause great bodily injury, Section 245 of the Penal Code, as to Robert Limon; in Count 10, Section 245 of the Penal Code as to Stephanie Sampson.
>
> You must first decide whether a defendant is guilty of Count 10 or 11, Section 245 of the Penal Code [assault with a deadly weapon or assault with likelihood of great bodily injury]. If you find that a defendant is guilty of this crime you must then decide whether he is guilty of murder.
>
> Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes at the same time.

////

To prove that a defendant is guilty of murder, the People must prove that:

1. The defendant is guilty of assault with a deadly weapon or by force likely to cause great bodily injury, Section 245 of the Penal Code in Count 10 or 11.

2. During the commission of Section 245 of the Penal Code, in Count 10 or 11, a co-participant in that Section 245 of the Penal Code in Count 10 or 11 committed the crime of murder; and

3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of murder was a natural and probable consequence of the commission of the Section 245 of the Penal Code in Count 10 or 11.

A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or an innocent bystander.

ECF No. 20-18 at E-page 66.

In the petition, Hernandez' makes the argument that because the Court of Appeal erroneously found that Hernandez was validly convicted of aggravated assault, he could only be liable for murder if he shared defendant Arias' murderous intent with respect to Spencer Sampson. However, because the undersigned has found under AEDPA, that a fairminded Court of Appeal could find aggravated assault, i.e., an assault with the likelihood of great bodily injury, petitioner's argument must fail.

**Grounds 2 and 3-- Insufficient Evidence for Gang Enhancement and Improper Instructions (Failure to Instruct on Necessary Nexus between PBT and Sureño)**

Hernandez conceded to the interviewing detective that he had a long-time association with the Sureño gang. ECF 20-16 at E-page 159; see also ECF No. 20-5 at E-page 90-93 (Hernandez Interview admitted into evidence). His attorney conceded such during final argument:

"But let's look at Armondo Hernandez more closely. Yes. He told the officers when he was interviewed that he was a Sureño. He said he had been a Sureño for some years, I think since he was 15. He said he didn't get jumped into the gang or anything, he just associated with them or hung out, and began considering himself a Sureño."

ECF No. 20-18 at E-page 16.

The Court of Appeal further found:

> Defendant Hernandez's cell phone had a GIF file (series of pictures) of defendant Hernandez and two other people. They were making signs with their hands signifying PBT (for Proud Brown Trece); there was a derogatory term in the pictures about Norteños; the men wore blue bandanas, which is indicative of Sureño gang membership; the word "Sur," signifying Sureño appeared; handguns were in the picture; and "X3" appeared, which reflects the number 13. Also on his phone were contacts identified by the monikers of several Sureño gang members, and it contained an obituary of another Sureño gang member. When defendant Hernandez was taken into custody, he had a blue bandana is his pocket, folded in the manner that Sureños fold bandanas. Detective Sierra gave his expert opinion based on the evidence that defendant Hernandez is a Sureño gang member.
>
> […]
>
> As to all three defendants, the evidence in this case established that they were hunting for Norteños to attack, which is a common activity of Sureño gang members. And they succeeded in that effort. Finally, they each associated and participated together with the other defendants in the activities for which they were prosecuted, thus providing further evidence of their Sureño gang membership.

People v. Hernandez, 2016 WL 879233 at *18.

As set out in the Court of Appeal opinion, all the defendants were found to be Sureños based on the telling admissions and the evidence produced and the opinion of the expert. To the extent that petitioner asserts that there was insufficient evidence to demonstrate that he was a Sureño (in addition to being a member of the sub-gang Proud Brown Trece[8]), such a contention is meritless.

Petitioner also argues that the evidence was insufficient in that the Sureños were not shown to be a criminal street gang, or did not engage in the gang activities proscribed by statute. The Court of Appeal carefully and accurately set out the testimony of the prosecution expert:

> Detective Matthew Sierra of the Tracy Police Department testified concerning gangs, specifically in Tracy. His focus was on Hispanic criminal street gangs. His duties included investigating gang crimes, talking to gang members, reading reports concerning gangs, talking to other officers who investigated gang crimes, and talking

---

[8] The undersigned takes judicial notice that "Trece" is Spanish for the number 13, a number commonly associated with Sureños.

to other agencies concerning gangs. On the motion of the prosecutor, and with no objection from counsel for the various defendants, Detective Sierra was declared an expert witness on Hispanic criminal street gangs within Tracy.

Detective Sierra commonly investigated the Sureño gang and crimes committed by gang members. Sureños identify themselves as Sureños when they are contacted. Sometimes, they also say that they are associated with a subset such as, in Tracy, Proud Brown Trece or South Side Riders, but those gang subset members are Sureños. Detective Sierra had daily contact with members of the Sureño criminal street gang.

Sureños and Norteños are large criminal street gangs in California and are rivals. There are more than 100 Sureños and more than 400 Norteños in Tracy. Of the more than 100 Sureños in Tracy, seven were of the Proud Brown Trece subset. Sureños associate themselves with variations on the number 13, including in tattoos and correspondence.

Detective Sierra testified that Sureños engage in murder, attempted murder, assault with a deadly weapon, shooting at an inhabited dwelling, shooting from a vehicle, torture, mayhem, kidnapping, identity theft, vandalism, burglary, possession of a stolen vehicle, possession of firearms, and drug sales. They commonly carry firearms and travel in groups for protection.

Sureño gang member Marcos Vasquez was convicted in 2009 of attempted murder, discharge of a firearm from a vehicle, street terrorism, and possession of a controlled substance.

Sureño gang member Jose Garcia Losa was convicted in 2009 of attempted murder and street terrorism. Garcia Losa was also convicted of possession of a handgun in 2008.

Sureño gang member Moises Laguna was convicted in 2009 of assault with a deadly weapon likely to produce great bodily injury and street terrorism for his involvement in the crimes with Garcia Losa.

Detective Sierra assisted in the investigation and prosecution of Vasquez, Garcia Losa, and Laguna.

People v. Hernandez, 2016 WL 879233 at *17-18.

The Court of Appeal continued:

Defendants contend that Detective Sierra's testimony failed to establish the "primary activities" element of the gang enhancement because (1) it was vague and conclusory and (2) it was unsupported by a credible and reliable foundation. We disagree.

Detective Sierra testified that Sureño gang members in Tracy engaged in crimes listed in section 186.22, subdivision (e) as their

> primary activities. He said that Sureños engage in "[m]urder, attempted murder, assault with a deadly weapon, shooting into an inhabited dwelling, shooting from a vehicle, drive-by shooting, torture, mayhem, kidnapping, identity theft, felony vandalism, burglary, possession of stolen vehicle[s], [and] being in possession of a handgun."
>
> A " 'criminal street gang' " is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage or have engaged in a pattern of criminal gang activity."9 (§ 186.22, subd. (f).) This component of the gang enhancement "requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.'" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1222, quoting *People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

People v. Hernandez, 2016 WL 879233 at *20.[9]

The Court of Appeal went on to discuss further state cases and why the evidence in this case conformed to those cases. This state law discussion is not impeachable in federal habeas. Bradshaw v. Richey, 546 U.S. 74, 76 (2005).

Petitioner's case had initially been reviewed by the Court of Appeal, but on petition for review was sent back to the Court of Appeal for a decision in light of the newly issued People v. Prunty, 62 Cal 4th 69 (2015), which had set standards for connecting the activities of sub-gangs to the gang at issue in a particular case, i.e., whether the activities of the sub-gangs could be connected to that of a larger criminal gang organization. The Court of Appeal correctly observed that the circumstances in petitioner's case were different:

> Unlike in *Prunty*, the prosecution in this case did not rely on the conduct of subsets to show a broader criminal street gang's

---

[9] Detective Sierra testified on several occasions at the trial. He was the lead investigator in this case as well as the prosecution's gang expert. Although some "gang testimony" took place during these several occasions, the vast bulk of his expert testimony regarding gangs took place at RT 3133-3265 (ECF Nos. 20-16 at E-page 179; 20-17 at E-page 16.) The undersigned has reviewed all of Detective Sierra's testimony.

existence. Instead, the prosecution in this case relied on the conduct of Sureños to show that Sureños are a criminal street gang. Therefore, the argument that *Prunty* requires reversal is without merit.

The evidence in this case established that defendants were Sureños. Therefore, evidence of the Sureños' primary activities and pattern of criminal conduct was appropriate and sufficient to establish that defendants committed their crimes for the benefit of a criminal street gang. [footnote omitted]

People v. Hernandez, 2016 WL 879233 at *20.

Upon review of the record in this case, the undersigned sees no reason to declare that the Court of Appeal was AEDPA unreasonable in its assessment of the record. There was no need for an instruction to the jury concerning a sub-gang's relationship to an umbrella gang.

### **Ground 4—Improper Excusal of a Juror**

The Court of Appeal set the background for this improper juror excusal ground:

Late in the trial, before closing arguments, the court informed defendants Arias and Hernandez that Juror No. 12 called the clerk that morning. The juror told the clerk that "she is sick. She is unable to finish the trial. She needs to be removed because of illness. She's going to the doctor today." Counsel for Arias said he did not want Juror No. 12 removed because there were two alternates that he did not want on the jury. Counsel for Hernandez argued that more evidence than just the juror's statement to the clerk was needed to justify removing the juror. He wondered if she just did not want to decide the case or that her illness was temporary and she could continue after getting better. The trial court ruled: "She says she's sick and is unable to continue in the jury.... [W]e just have to go with what the juror says. That's why we have alternates. We have three alternates. We'll choose one at random, but based on the statement of the juror to my clerk, she called this morning and said she'd be unable to continue[.] I will excuse her over objection."

The evidence here, as established by the juror's statements to the clerk, was that Juror No. 12 was ill and was unable to continue, and the trial court actually relied on that evidence in determining that she was unable to proceed. Other than counsel's speculation that Juror No. 12 was not sick but really just did not want to decide the case, there is nothing to cast doubt on the valid, statutory reason for the removal.

People v. Hernandez, 2016 WL 879233 at *11; see also ECF No. 20-17 at E-pages 203-205.

It should be noted that petitioner's trial was a lengthy trial. In fact, the trial judge in this case told the jurors after instructions had been given that it had been the second longest trial in his

24

career.  ECF No. 20-18 at E-page 90.  It is not difficult to understand that any ordinary juror would be naturally growing weary of service at this point, and continuing trial for an indefinite time to ferret out the bona fides of one juror's illness excuse would work a hardship on all.  As the judge stated: "She says she's sick and is unable to continue in the jury.  I mean, you know, the question is how far do we go?  I'm not going to bring in a doctor or have an investigation, but I think I can -- we just have to go with what the juror says."  ECF No. 20-17 at E-pages 203-204.

Certainly, it can be improper to remove a juror for cause when that cause is lacking.   But that cause relates to the juror's supposed bias or some other connection to the case.  See, e.g., and generally Wainwright v. Witt, 469 U.S. 412 (1985); Uttecht v. Brown, 551 U.S. 1 (2007).   The undersigned is hard pressed to find a case holding that acquiescing in a juror's statement that he/she is too ill to serve becomes a matter of Constitutional significance in that a hearing must be held with the ill juror such that the bona fides of the illness can be fully investigated.  Certainly, petitioner has not cited to any.  The undersigned agrees with respondent that requiring a hearing/investigation for every juror replacement, no matter how unrelated to the case, would constitute a new rule barred by Teague v. Lane, 489 U.S. 288 (1993).  In the alternative, petitioner has demonstrated no facts to overcome the AEDPA presumption of correctness for the trial and appellate state court factual finding that this juror was excused for a legitimate illness.

The Teague case held that with few exceptions not applicable here, new rules of procedure, i.e., not dictated by precedent at the time the conviction became final, cannot be retroactively applied to a particular case situation in habeas corpus.  See Horn v. Banks, 536 U.S. 266 (2002), and the AEDPA standard did not replace the Teague rule.  Id. at 272.  Finality of conviction is not an issue here in that the undersigned is unaware of any cases which *require* the type of hearing/investigation petitioner requests in cases where the reason for excusal has nothing to do with the substance or process of the case.  For example, if a juror phoned in the excuse of the death of a family member, petitioner would have the trial halted, until all services were scheduled to be completed, so that the court could factually investigate whether the juror's statement was honest.  Such excuses are often accepted at face value on voir dire, and a mandatory investigation rule after trial starts hardly seems necessary or wise.  There being no

"dictated by precedent" rule which requires such a hearing, the court need go no further in its Teague analysis.[10]

In any event, petitioner has gone no distance in upsetting the presumption of correctness afforded state courts under AEDPA, 28 U.S.C. section 2254(e)(1), and petitioner has the burden. Here, the trial judge decided to believe the juror based on a phone call, and in the absence of any other facts which would make a reasonable trial judge suspicious of the excuse, such should be sufficient. The argument that petitioner should be afforded an evidentiary hearing in habeas to attempt to discover the facts which would meet his burden is meritless. Claim 4 should be denied.

*Conclusion*

Perhaps petitioner wishes he could call back the senseless Norteño hunting expedition in which he engaged, and which resulted in the death of an individual. But he cannot and the consequences of that senseless expedition must be upheld. The petition should be denied.

Accordingly, IT IS HEREBY ORDERED that a district judge be assigned to this case.

IT IS HEREBY RECOMMENDED that:

1. The petition (ECF No. 1) be denied; and

2. A Certificate of Appealability (COA) be issued only on the issue of whether presentation of an invalid theory of conviction was harmless error.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are

////

---

[10] Also, petitioner's argument here sets up a damned-if-you-do, damned-if-you-don't, situation. If the trial judge here had required the ill juror to show up for final argument and deliberations, petitioner would be protesting the fact that the juror was so ill he/she could not meaningfully deliberate.

advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 26, 2018

<u>/s/ Gregory G. Hollows</u>
UNITED STATES MAGISTRATE JUDGE